

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7734 | **DATE** | 12/29/2004 |
| **CASE TITLE** | | Stewart Davies vs. Jo Anne B. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order plaintiff's motion for summary judgment. Plaintiff's motion for summary judgment is granted in so far as it requests a remand of the ALJ's decision [17-1]. The defendant's motion for summary judgment [24-1] is denied. The case is hereby remanded to the Commissioner of Social Security for further proceedings consistent with this opinion.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 30 2004 | 28 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | 15 | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/29/2004 | |
| | | | date mailed notice | |
| SM | courtroom deputy's initials | | SM | |
| | | | mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DECEIVED

DEC 3 0 2004

| | | |
|---|---|---|
| STEWART DAVIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 7734 |
| | ) | Ian H. Levin, |
| JO ANNE B. BARNHART, | ) | Magistrate Judge |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stewart Davies brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration (the "SSA") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). Before the court are the parties' cross-motions for summary judgment in the case. For the reasons set forth below, the court remands this case for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on April 19, 2001, alleging that he been disabled since April 9, 1998, as a result of chronic fatigue syndrome. (R. 93-96).[1] The SSA denied his application at the initial levels of administrative review (R. 70-75, 77-81), and he requested an administrative hearing. On July 11, 2002, an administrative law judge

---

[1] References are to the certified administrative record prepared by the Commissioner and filed with this court pursuant to 42 U.S.C. § 405(g).

("ALJ") conducted a hearing at which plaintiff, represented by counsel, appeared and testified. (R. 23-69). In addition, Linda Gels testified as a vocational expert. (R. 51-68). In a decision dated July 26, 2002, the ALJ found that plaintiff was not disabled because he retained the capacity to perform his past relevant work as a cashier. (R. 16-22). This became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of the decision on September 5, 2003. (R. 5-7). *See* 20 C.F.R. §§ 404.955; 404.981. Pursuant to 42 U.S.C. §405(g), plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

Plaintiff was born on May 3, 1949, making him fifty-three years old at the time of the ALJ's decision. (R. 93). He graduated from high school and spent three years in college. (R. 143). He also received avionics technology training in the army. (R. 143). Over the last few years, plaintiff's work history has been sporadic. He has spent every winter the past several years working at a ski resort in Park City, Utah. (R. 30, 128). This was essentially part-time work as a cashier in a restaurant. (R. 32, 128). During the summers of those years, he has lived in Chicago, and had a part-time job testing computer software until 2001. (R. 30, 120). Prior to that, plaintiff also worked in the building trades, and in automobile and appliance sales. (R. 120, 128).

# I. MEDICAL EVIDENCE

The relevant medical evidence in this case dates from September of 1997, when plaintiff arrived at the Salt Lake City Veterans' Administration Medical Center ("VAMC"), complaining of pounding in his chest and fatigue. An ECG was normal (R. 251-52), although certain other test results, including red blood cell count, were consistent with iron deficiency anemia. (R. 248). Shortly thereafter, plaintiff was treated for a blood clot in his left leg at the North Chicago VAMC. (R. 248). He attributed this problem to having made the drive from Salt Lake City to Chicago. (R. 248). He then returned to Salt Lake City, and the clot resolved with anticoagulant treatment by December 3, 1997. (R. 249).

Plaintiff's complaints of fatigue and lack of energy continued into the next year. (R. 247). He also began to complain of problems with his memory. (R. 249). Plaintiff's red blood cell count, however, had returned to normal range by January 30, 1998. (R. 249). Additional testing – a CT scan of the abdomen and barium enema – was negative. (R. 249). On April 10, 1998, however, blood test results were consistent with pernicious anemia.[2] (R. 249, 258). Physicians started plaintiff on a course of iron sulfate, multiple vitamins, and vitamin B12 injections. (R. 249).

---

[2]  Anemia caused by a vitamin B12 deficiency. THE MERCK MANUAL, at 866 (17th ed. 1999).

In August of 1998, plaintiff underwent an EKG stress test. (R. 476). While his exercise tolerance was described as poor, the test produced no arrhythmia[3] or chest pain. (R. 476). Blood pressure changes were normal. (R. 476). Plaintiff reported back to the Salt Lake City VAMC about every six months for follow-up. (R. 241-46, 248). Based on testing for iron levels in plaintiff's blood, his anemia persisted into the following year. (R. 248). He also continued to complain of chronic fatigue and shortness of breath. (R. 246). According to plaintiff, his health seemed better when he was in Chicago, whether due to a lower altitude or better nutrition. (R. 242).

On May 10, 1999, plaintiff underwent a series of cognitive tests. (R. 239-241). The results placed plaintiff in the average range of intellectual functioning overall. (R. 240). His memory for verbal and visual information was in the average to high range. (R. 241). Plaintiff's visual-spatial abilities were in the superior range. (R. 241). Overall, there was no evidence of cognitive decline from prior testing. (R. 241). While plaintiff complained of memory problems, when he focused on tasks during the testing, he scored in the average to high range. (R. 241). There was no evidence of depression or anxiety. (R. 241).

Plaintiff returned to the Salt Lake City VAMC on December 9, 1999, complaining of shortness of breath upon exertion, and overall weakness. (R. 236- 238). In addition,

---

[3]    Any variation from the normal rhythm of the heartbeat; the term encompasses abnormal regular and irregular rhythms, as well as loss of rhythm. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, at 121 (28th ed. 1994).

he also related that he experienced stiffness and aching joints. (R. 237). Plaintiff's anemia had nearly normalized at that time as a result of B12 treatment. (R. 238). Iron replacement seemed to be effective, although plaintiff's iron level was noted to be low that day. (R. 238-39). His persistent fatigue and shortness of breath, however, continued, and he returned to the VAMC in April 2000. (R. 233). A CT scan of the chest at that time showed no evidence of interstitial lung disease. (R. 236).

On November 15, 2000, plaintiff went to the Salt Lake City VAMC complaining of right leg pain following a two-day drive from Chicago. (R. 231). Aside from some tenderness to palpation in the right leg, physical examination was normal. (R. 232). Plaintiff exhibited a full range of motion in his lower extremities and his gait was normal. (R. 232). There was, however, some redness in the skin of his foot and ankle. (R. 232).

Plaintiff returned to the VAMC on December 28, 2000, with complaints of an irregular heartbeat. (R. 230). According to plaintiff, he suffered such episodes two to three times a day, and they were sometimes accompanied by chest tightness and shortness of breath. (R. 230). Physical examination, including cardiovascular examination, was essentially normal. (R. 230-31). An ECG revealed a normal sinus rhythm. (R. 231). The attending physician noted the plaintiff's history of normal cardiac testing, and assured plaintiff that the irregular heart beats were benign in nature. (R. 231).

On January 22, 2001, plaintiff continued to complain of fatigue, decreased concentration, and exercise intolerance. (R. 221). The attending physician noted a

5

history of chronic fatigue syndrome due to the length and quality of plaintiff's symptoms. (R. 221). Plaintiff indicated that he became short of breath, dizzy, and experienced blurred vision after five ski runs. (R. 221). He also complained of fatigue following his four-hour shift as a cashier. (R. 221). There was no evidence of depression. (R. 222). Plaintiff claimed to sleep well, yet awake fatigued. (R. 222). He stated that he experienced knee pain and swelling after running, and right hip pain after exertion. (R. 222). Physical examination was normal, with the exception of finger coordination, which was poor. (R. 222-23).

Plaintiff sought testing to evaluate his complaints of failing memory on February 9, 2001. (R. 218). He said he was frustrated with his memory, and complained of fatigue. (R. 218). His fatigue had caused him to cut back on his work hours and on his skiing, skiing just nineteen days since the first of the year, or about every other day. (R. 218). Despite these complaints, he had no problems with sleep, depression, decreased appetite, or decreased libido. (R. 218). Tests of plaintiff's intellectual ability showed plaintiff to be in the high average to high superior range. (R. 219). Measures of attention, processing speed, and concentration were in the low average to superior range, with the poorest results adversely affected by plaintiff's lack of fine motor agility. (R. 219). The scores had not decreased significantly from prior testing, however. (R. 219). Auditory memory testing revealed a decline in long term memory and retention, with results in the low average to average range. (R. 219). The attending psychologist could only speculate

as to the effect plaintiff's anemia and chronic fatigue might be having on his memory. (R. 220).

On December 18, 2001, Dr. Barry Rappaport performed a consultative exam of plaintiff for the Bureau of Disability Determination Services. (R. 297-303). Plaintiff listed his complaints: chronic fatigue; pain in his right hip, right knee, and right wrist due to wounds suffered in Viet Nam and in a motorcycle accident; and arrhythmia. (R. 297). According to plaintiff, he had trouble falling asleep and staying asleep. (R. 297). He said he took naps during the day. (R. 297). Plaintiff also reported that Tylenol and Ibuprofen helped relieve his pain. (R. 297). Physical examination was essentially normal. (R. 289-99). Plaintiff had a full range of motion in his lumbosacral spine and in all joints except his right wrist. (R. 299). Grip strength in the right hand was slightly limited to 4.5 on a 5-point scale. (R. 299). Strength, sensation, and reflexes were all normal. (R. 299). According to Dr. Rappaport, plaintiff's medical files contained no objective evidence of chronic fatigue syndrome. (R. 299). Plaintiff's anemia was stable. (R. 230). Dr. Rappaport also noted that plaintiff was not being treated for arrhythmia. (R. 300).

Dr. Mussarat Zahid performed a psychiatric examination of plaintiff at the request of the state disability agency, also on December 18, 2001. (R. 304-06). Plaintiff told Dr. Zahid that his chronic fatigue syndrome had resulted in depression. (R. 304). According to plaintiff, his memory impairment left him unable to function. (R. 304). Plaintiff indicated he was living with his mother, and doing the household chores and cooking.

(R. 305). He could recall six digits forward and three in reverse. (R. 305). He could name the past three presidents. (R. 305). After examination, Dr. Zahid felt plaintiff had a mild cognitive impairment affecting only his memory, and symptoms of depression. (R. 306). Prognosis was fair, if plaintiff were treated for depression and memory problem. (R. 306). Dr. Zahid did not know if plaintiff could function at a job given his memory impairment. (R. 306).

Plaintiff underwent another consultative physical examination on July 26, 2001. (R. 315-18). Dr. Roopa Karri noted plaintiff's complaints of chronic fatigue; memory loss; arthritis in the knees, wrists, hands and right ankle; low back pain; and hearing loss. (R. 315). Plaintiff complained that he became exhausted merely crossing the street. (R. 315). He said he slept well, however. (R. 315). As an example of his memory problems, he explained it sometimes took him three trips to the store to get what he needed. (R. 316). According to plaintiff, if he stopped taking his B12 tablets, he would get dizzy and nauseous. (R. 316). Physical examination was essentially normal. (R. 316-17). Plaintiff's right hand, however, was swollen and tender. (R. 317). His range of motion was normal in his spine and all joints except for his right wrist. (R. 317). His ability to grasp and manipulate was normal, however. (R. 317). Plaintiff's reflexes were normal, but there was decreased sensation in the fingers of the left hand. (R. 317). His gait was normal. (R. 316).

Plaintiff also underwent another psychiatric evaluation that same day. (R. 319-22). Dr. Allan Nelson noted that plaintiff complained of developing a memory problem over the previous three years. (R. 319). Plaintiff also complained of chronic insomnia. (R. 319). He could not remember the day of the week, but could remember many specific details of the previous twenty-four hours. (R. 321). Plaintiff could recall six digits forward and three in reverse, and could perform serial threes. (R. 321). He could name the last four presidents, vice president, mayor, and governor. (R. 321). Dr. Nelson felt plaintiff's memory was moderately impaired and that he was probably developing an organic brain disorder of unknown etiology. (R. 321). He recommended a neurological examination, and felt the overall prognosis was guarded. (R. 321).

On October 12, 2001, Dr. Brian Wu reviewed plaintiff's medical records at the request of plaintiff's counsel. (R. 323). Dr. Wu was apparently plaintiff's treating physician at one time. (R. 37). Based on the records from the VAMC, Dr. Wu felt plaintiff had chronic fatigue syndrome and could not do anything for more than two hours. (R. 324). The doctor felt plaintiff could sit for just one hour before he had to stretch, and could not reach above shoulder level. (R. 326-27).

State disability agency psychologist Carl Hermsmeyer reviewed plaintiff's medical records on January 17, 2002, after having reviewed them earlier, on August 30, 2001. (R. 271). Dr. Hermsmeyer felt plaintiff was moderately limited in his ability to understand and remember detailed instructions and carry out such instructions. (R. 267-68). The

psychologist also opined that plaintiff was mildly restricted in daily activities, and moderately restricted in social functioning and maintaining concentration. (R. 281). He thought plaintiff had the capacity to perform work involving simple tasks. (R. 269).

On January 18, 2002, state disability agency physician Paul LaFata reviewed plaintiff's medical record and concluded that, in a normal workday, he was capable of lifting up to twenty pounds occasionally and ten pounds frequently, standing or walking for six hours, and sitting for six hours. (R. 308). On February 6, 2002, state disability agency psychologist John Tomassetti reviewed Dr. Zahid's report and concluded plaintiff had a mild memory impairment. (R. 332). According to the psychologist, this would result in mild limitations on daily activities, social functioning, and concentration. (R. 341). In the workplace, Dr. Tomassetti stated that plaintiff would be moderately limited in his ability to carry out detailed instructions, maintain concentration for extended periods, and perform at a consistent pace without interruptions. (R. 345-46). Overall, Dr. Tomassetti felt plaintiff retained significant mental capacity for work. (R. 347).

## II. PLAINTIFF'S TESTIMONY

Plaintiff testified that the drive to his administrative hearing – one hour and forty-eight minutes – had left him drained. (R. 30). He stated that he worked winters at a ski resort in Utah and, until recently, summers in Chicago testing software. (R. 30-31). He also indicated that for the previous two years, he had been trying to market a computer game he invented, by attending conventions and by other means. (R. 31). Plaintiff

explained that he could no longer perform his cashier job at the ski resort because he could only work a couple of hours a day. (R. 32). If he worked two or three hours, he would get dizzy or nauseous. (R. 34). He was able to ski on his days off, one or two days a week, for twenty or thirty seconds at a time, resting in between. (R. 33). Plaintiff said he used to ski one hundred days a year before his CFS. (R. 33). He also said he used to run fifteen miles a day, but gave up running seven years ago. (R. 41). According to plaintiff, he once could make the 1300-mile drive between Chicago and Salt Lake City in a single day; now it took him two to three days. (R. 50). Plaintiff finished second in an employee ski race at the resort in Utah in the year before the hearing, but lamented the fact that he could no longer ski at the highly competitive level he once had. (R. 48). He explained that, after the fifteen-second race, he could not stand up, and became dizzy and nauseous. (R. 48).

Plaintiff related that when he took his Cyanocobalamin – vitamin B12 – he did not experience his symptoms of blurry vision, dizziness, nausea, or itching. (R. 37-38). Due to his failing memory, however, he sometimes forgot to take it. (R. 38). He stated that he took Sotalol for arrhythmia, which made him drowsy. (R. 38). He took over-the-counter medications for pain, two to three times a week. (R. 38-39). According to plaintiff, he took iron supplements when his test results indicated his iron level was low. (R. 39).

Plaintiff testified that he suffers joint pain constantly. (R. 42). He said he becomes short of breath very easily, after walking as little as 100 or 200 feet. (R. 43). He also said he experienced episodes of blurred vision, dizziness, or nausea when he had not eaten for a couple hours. (R. 43). Plaintiff felt that his memory was terrible. (R. 44). As an example, he related that he could go to the store and forget what he went there to buy in the first place. (R. 44). He takes frequent naps. (R. 45). On a bad day, he might doze all day; on a good day, he might not nap at all. (R. 45). Plaintiff felt he could stand for thirty or forty minutes, but would be wiped out the rest of the day. (R. 45). He thought he could sit for thirty or forty minutes at a time if he could get up and stretch. (R. 45). Plaintiff estimated that he could lift one hundred pounds, but only thirty or forty pounds for a few minutes. (R. 46).

Plaintiff testified that he lives with his mother in a house on about half an acre of land. (R. 47). Around the house, he said he microwaved things, vacuumed, washed dishes, and did his laundry. (R. 47). He explained that dressing himself tired him out. (R. 47). Plaintiff said he was able to mow the lawn, on a riding mower, for a few minutes at a time, resting in between. (R. 47). He testified that he was able to play video games and type briefly at a computer. (R. 49, 67). He said he might go to a movie two or three times a month, but would have to take a three-hour nap before going. (R. 49).

# III. VOCATIONAL EXPERT'S TESTIMONY

The VE testified after plaintiff, and she indicated that plaintiff's past work at the ski resort, which included jobs as a cashier and an information clerk, ranged between sedentary and light in exertional level. (R. 54-55). The ALJ asked whether a hypothetical individual of the same age, education, and work background as plaintiff, who could lift twenty pounds occasionally; ten pounds frequently; sit, stand, or walk for six hours in a workday; and who was limited to simple, unskilled work, could perform any of the jobs plaintiff had previously held. (R. 59). The VE felt such an individual could perform the plaintiff's cashier job. (R. 59). The ALJ then added an additional restriction of an inability to work around heights or with hazardous machinery, and the VE opined that the cashier position would still be within such a person's capacity. (R. 60). According to the VE, there were 11,000 such jobs in the Chicago area. (R. 61). Upon further questioning from plaintiff's counsel and the ALJ, the VE testified that such work was not stressful in terms of quotas, deadlines, or fast pace. (R. 61-62).

# IV. THE ALJ'S DECISION

The ALJ found that, despite a record of some earnings, the evidence did not establish that plaintiff had engaged in any substantial gainful activity that would disqualify him from receiving DIB. (R. 17, 21). Next, she determined that plaintiff had several severe impairments: chronic fatigue syndrome, anemia, joint pain, and deficiencies in memory and concentration. (R. 21). These impairments, according to the

ALJ, met the Agency's requirement that a severe impairment significantly limit the ability to perform basic work activities. (*Id.*). *See* 20 C.F.R. § 404.1520(c). The ALJ further determined, however, that none of these impairments, either singly or in combination, met or equaled an impairment listed in the Agency's regulations as disabling. (R. 17, 21). *See* 20 C.F.R. Pt. 404, Subst. P, App. 1, Listing of Impairments. More specifically, the ALJ noted that plaintiff's memory loss resulted in only mild limitations on daily activities and social functioning, moderate limitations on concentration, persistence, and pace, and had not resulted in any episodes of decompensation. (R. 17).

Next, the ALJ assessed plaintiff's residual functional capacity ("RFC"). The ALJ found that plaintiff retained the capacity to lift twenty pounds occasionally and ten pounds frequently, and to perform simple, unskilled tasks, but could not work around unprotected heights or with dangerous machinery. (R. 17, 21). In determining plaintiff's RFC, the ALJ reviewed the medical evidence. She discussed plaintiff's course of treatment for anemia. (R. 18). She noted that plaintiff felt better while in Chicago than he did in Utah and that by December 1999, his anemia had nearly resolved. (R. 18). The ALJ also observed that testing in April of 1998 revealed average attention and memory capabilities, and that a year later, testing revealed plaintiff's cognitive status was unchanged. (R. 18). Cardiac testing, the ALJ noted, failed to disclose any etiology of plaintiff's complaints of arrhythmia or shortness of breath, and the most recent ECG and EKG were normal. (R. 18, 19). The ALJ acknowledged that, by February of 2001,

14

memory testing demonstrated a decline in plaintiff's capabilities, but she noted that scores for immediate memory were within the average range. (R. 18). Psychological testing in December 2001, the ALJ noted, indicated no more than a mild cognitive impairment. (R. 19). She felt plaintiff's inability to recall current events might stem from a lack of interest as opposed to a memory impairment. (R. 19).

The ALJ also considered the plaintiff's subjective complaints and testimony, indicating that she considered the factors described in 20 C.F.R. § 404.1526(c)(3) and Social Security Ruling 96-7p. (R. 19). She felt his demeanor at the hearing was not compatible with the debilitating effects of chronic fatigue syndrome he claimed to suffer. (R. 19). The ALJ observed that plaintiff seemed to be overly dramatic, yawning expansively at the beginning of the hearing and then virtually not at all after that. (R. 19). The ALJ also noted that plaintiff was able to recall the dates of his tenure in various jobs and details to other questions as well. (R. 19). The ALJ noted that, while plaintiff said he was drained after a one hour and forty-eight minute drive to the hearing, he nevertheless drove 1300 miles to Utah in two days each winter and back each spring. (R. 20). She further noted that plaintiff worked fifteen hours a week and skied on his days off. (R. 20). The ALJ reviewed plaintiff's daily activities, including mowing the lawn on a riding mower, vacuuming, washing dishes, doing laundry, and shopping. (R. 20).

The ALJ regarded the opinion of plaintiff's former treating physician, Dr. Wu, that plaintiff cannot engage in any activity for more than two hours. (R. 20). Because the doctor based his conclusion on a 1995 diagnosis of chronic fatigue and provided no independent support for the opinion, however, the ALJ discounted it. (R. 20). The ALJ also questioned the opinion of the psychological consulting examiner who felt that plaintiff could not function in a job due to his memory, noting that he nevertheless diagnosed only a mild memory loss. (R. 20).

The ALJ then considered the requirements of plaintiff's work as a cashier. She noted that the VE testified that the exertional requirements of that job were consistent with the residual functional capacity the ALJ had found. (R. 20-21). The ALJ also noted that the VE testified that, even if plaintiff could not perform that work, there were still a significant number of jobs in the national economy that a hypothetical individual with plaintiff's limitations could perform. (R. 20-21). Accordingly, the ALJ concluded that plaintiff was not disabled, and was not entitled to DIB under the Act. (R. 18-19).

## LEGAL STANDARDS

### I. STANDARD OF REVIEW

The applicable standard of review of the Commissioner's decision is a familiar one: the court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997),

*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion*, 108 F.3d at 782. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must have "articulated" the reasons for her decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Id.* Although the ALJ need not address every piece of evidence, the ALJ cannot limit her discussion to only that evidence that supports her ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of her findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595.

## II. STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, a DIB claimant must be "disabled" as defined by the Act. *See* 42 U.S.C. § 423(a)(1)(D); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir.1993). An individual is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); *see also Jones v. Shalala*, 10 F.3d 522, 523-24 (7th Cir.1993). To satisfy this definition, an individual must have a severe impairment that renders him unable to do his previous work or any other substantial gainful activity that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

The Social Security regulations delineate a five-step process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits ... physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(a)(4)(ii). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt.

404, Subst. P, App.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's RFC and the physical and mental demands of his past work. RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *See* 20 C.F.R. §§ 404.1545(a). *See also* Social Security Ruling 96-8p (1996). If the claimant can perform his past relevant work, he will be found not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

For the fifth step, if the claimant shows that his impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant – in light of his age, education, job experience and functional capacity to work – is capable of performing other work and that such work exists in the national economy. *See* 42 U .S.C. § 423(d)(2); 20 C.F.R. § 404.1520(a)(4)(v). *See also Brewer*, 103 F.3d at 1391.

## ANALYSIS

The plaintiff finds several flaws in the ALJ's decision, relating both to plaintiff's physical and mental impairments. Plaintiff submits that the ALJ failed to follow the applicable Social Security Ruling in evaluating plaintiff's chronic fatigue syndrome. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand*, at 11-

19). More specifically, the plaintiff argues that the ALJ improperly discredited plaintiff's complaints of fatigue insofar as she focused on her observations of plaintiff at the hearing and plaintiff's daily activities. (*Id.* at 12-17). Further, according to plaintiff, the ALJ failed to properly evaluate his subjective complaints as required by the applicable regulations and Social Security Rulings. (*Id.* at 17-19). In addition, the plaintiff contends that the ALJ improperly discredited evidence of his mental residual functional capacity for work. (*Id.* at 19). As a result, according to plaintiff, the ALJ failed to provide an accurate view of plaintiff's limitations in the hypotheticals she presented to the VE. (*Id.* at 20-21). Finally, plaintiff argues that the ALJ improperly discredited Dr. Wu's opinion of plaintiff's residual functional capacity. (*Id.* at 21-22).

Allegations of disability due to chronic fatigue syndrome ("CFS") present challenging circumstances for ALJs, because its symptoms are entirely subjective. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996) (drawing comparison between CFS and fibromyalgia); *see also Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001)( though CFS has no specific etiology or pathology, CFS disability claim must still be accompanied by medical signs or laboratory findings); *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998) (discussing subjective complaints in context of diagnosis for chronic fatigue syndrome). The Commissioner addressed the handling of these claims in Social Security Ruling (SSR) 99-2p, Titles II and XVI: Evaluating Cases Involving Chronic Fatigue

Syndrome (CFS), 64 Fed.Reg. 23380.[4] Drawing from the Center for Disease Control's case criteria, the ruling defines CFS as a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity, and characterized in part by prolonged fatigue that lasts 6 months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities. SSR 99-2p, 64 Fed.Reg. at 23381. It involves the concurrence of four or more of the following symptoms, all of which have persisted or recurred during six or more consecutive months and none of which predated the fatigue:

(1) Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;

(2) Sore throat;

(3) Tender cervical or axillary lymph nodes;

(4) Muscle pain;

(5) Multi-joint pain without joint swelling or redness;

(6) Headaches of a new type, pattern, or severity;

(7) Unrefreshing sleep; and

(8) Postexertional malaise lasting more than 24 hours.

---

[4] Social Security Rulings are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1); *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

SSR 99-2p, 64 Fed.Reg. at 23381; *see also* THE MERCK MANUAL, at 2482 (17th ed. 1999). Such symptoms, as the Seventh Circuit has acknowledged, are easy to fake. *Sarchet*, 78 F.3d at 307. As such, the Commissioner requires that CFS – like any impairment – be established through medical signs and laboratory findings. SSR 99-2p, 64 Fed.Reg. at 23381-2; 20 C.F.R. § 404.1508. To that end, the ruling lists examples of medical signs that establish the existence of CFS as a medically determinable impairment.[5]

---

[5]   Under the ruling, one or more of the following medical signs clinically documented over a period of at least 6 consecutive months establishes the existence of a medically determinable impairment for individuals with CFS:

> (1) Palpably swollen or tender lymph nodes on physical examination;
>
> (2) Nonexudative pharyngitis;
>
> (3) Persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points; or
>
> (4) Any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record.

64 Fed.Reg. at 23382. It also lists the following examples of laboratory findings that establish the existence of CFS:

> (1) An elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640;
>
> (2) An abnormal magnetic resonance imaging (MRI) brain scan;
>
> (3) Neurally mediated hypotension as shown by tilt table testing or another clinically accepted form of testing; or
>
> (4) Any other laboratory findings that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record; for
>
> (continued...)

Here, although the ALJ did not refer to SSR 99-2p, she did allow that the medical evidence established that plaintiff suffered from CFS.

Under the ruling, once a medically determinable impairment has been established, a claim involving CFS is adjudicated – as any claim would be – by following the sequential evaluation. SSR 99-2p, 64 Fed.Reg. at 23382. The ruling requires the ALJ to "consider the individual has an impairment that could reasonably be expected to produce . . . symptoms associated with CFS." SSR 99-2p, 64 Fed.Reg. at 23382. The ALJ must determine, at step two, whether those symptoms – such as fatigue, pain, or neurocognitive problems – cause limitations that have more than a minimal effect on the individual's ability to perform basic work activities. SSR 99-2p, 64 Fed.Reg. at 23382. In other words, the ALJ must determine whether the CFS symptoms amount to a severe impairment. Again, the ALJ in this case did not discuss the ruling; she did, however, conclude at step two that plaintiff's CFS was a severe impairment. (R. 17, 21). Thus, the

---

[5](...continued)
example, an abnormal exercise stress test or abnormal sleep studies, appropriately evaluated and consistent with the other evidence in the case record.

SSR 99-2p, 64 Fed.Reg. at 23382. The ruling also acknowledges that some individuals with CFS report ongoing problems with certain aspects of mental functioning. As such, when mental status examination or psychological testing document deficits in short-term memory, information processing, visual-spatial difficulties, comprehension, concentration, speech, word-finding, calculation, and other symptoms suggesting persistent neurocognitive impairment, such findings constitute medical signs or laboratory findings that establish the presence of a medically determinable impairment. SSR 99-2p, 64 Fed.Reg. at 23382. Similarly, appropriately documented medical signs, such as anxiety or depression, indicative of the existence of a mental disorder, will also establish the existence of a medically determinable impairment is established. SSR 99-2p, 64 Fed.Reg. at 23382.

ALJ's neglect of the ruling's requirements for establishing CFS as a medically determinable impairment and determining whether it was "severe" was, from the plaintiff's perspective, harmless error. It may, however, have adversely affected the ALJ's consideration of plaintiff's symptoms and limitations, especially given the subjective nature of the disease.

Plaintiff's attack on the ALJ's failure to consider SSR 99-2p focuses on the ALJ's treatment of plaintiff's allegations regarding his symptoms. Under the ruling, the ALJ must assess all of the individual's symptoms under SSR 96-7p and determine how they impact upon their RFC. SSR 99-2p, 64 Fed.Reg. at 23382. According to the plaintiff, in so doing, the ALJ improperly discredited his complaints of fatigue based on plaintiff's demeanor at the hearing and his account of his activities. Some of plaintiff's arguments on this issue invite the court to engage in the kind of "nit-picking" that is inappropriate in a review of an ALJ's decision. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir.1999). Some serve to highlight just how difficult a disability claim based on CFS is to adjudicate.[6] Nevertheless, the court does have concerns with certain aspects of the ALJ's

---

[6] For example, plaintiff argues that there is no question that he suffered from pernicious anemia from 1997 through 1999 and that he was diagnosed with CFS. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand*, at 13). Plaintiff then cites a discussion in a medical textbook explaining how severe the fatigue from CFS might be. (*Id.*). From that premise, plaintiff submits that it is self-evident that he would suffer from fatigue that was severe enough to interfere with work and activities. (*Id.*). Curiously, plaintiff shortly thereafter calls the ALJ to task for "compar[ing] Plaintiff's level of fatigue with other imagined individuals with the same illness . . ." (*Id.*). Obviously, in posing an argument based on a hypothetical textbook description, plaintiff is guilty of the same type of comparison.

decision, and those concerns lead us to remand this matter to the Commissioner for further proceedings.

The plaintiff criticizes the ALJ's assessment of his complaints of fatigue insofar as it was based on her observations of him at the hearing and his daily activities. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand*, at 13). It is unclear whether plaintiff is arguing that the ALJ's reference to such factors was inappropriate but, if so, such an argument is unavailing. In assessing a plaintiff's subjective complaints, an ALJ must follow specific requirements set forth in SSR 96-7p, 1996 WL 374186. The ALJ evaluates the effects of the complained-of pain – or, as here, complained-of fatigue – on the individual's functional ability to work, taking into account the claimant's daily activities; his past work history and efforts to work; the dosage, effectiveness, and side effects of medication; the nature and intensity of the reported pain; medical evidence from treating physicians and third parties; medical evidence and laboratory findings; and the course of treatment. SSR 96-7p, 1996 WL 374186, *5; *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir.2004). The ALJ is also free to consider her own observations of the individual at the administrative hearing. SSR 96-7p, 1996 WL 374186, *5; *Herron*, 19 F.3d at 335 (noting that, in the context of a credibility assessment, the ALJ is in the best position to observe witnesses). Thus, there was nothing wrong with the ALJ discussing of plaintiff's demeanor or his activities.

In discussing the plaintiff's appearance while he testified at the hearing, the ALJ described plaintiff's demeanor as:

> generally unpersuasive . . . For example, he came into the hearing room yawning loudly and expressively, but virtually stopped yawning altogether during the proceedings. Given his appearance and physical condition, [plaintiff] did not appear to manifest the debilitating and physical fatigue that is commonly characteristic of chronic fatigue syndrome . . .

(R. 19). The plaintiff takes issue with this comment, basically, because it is a version of the "sit and squirm" test. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand*, at 14). According to the plaintiff, because fatigue is subjective, its presence and severity cannot be judged based on how an individual looks or behaves at a hearing. (*Id.*). Certainly, the Seventh Circuit has expressed its discomfort with the "sit and squirm" test. *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). But discounting such observations by ALJs raises the question of just why their opportunity to observe the plaintiff at a hearing is of any value to a credibility determination. *Id.* (noting that even those courts "opposing the 'sit and squirm' test endorse the validity of a hearing officer's observations of the claimant"). On the other hand, an ALJ does leave herself open to the type of criticism the plaintiff levels here when she employs some type of "yawn-o-meter" in her evaluation of a plaintiff's symptoms. In the absence of further analysis, such an observation might provide a questionable basis for rejecting plaintiff's allegations, and might in and of itself be cause for a remand. Here, however, the ALJ went beyond plaintiff's demeanor in assessing his credibility and discussed plaintiff's treatment and

activities. The ALJ's assessment of those topics, unfortunately, is a greater concern for the court.

In addition to her observations regarding the plaintiff's demeanor, the ALJ also commented that plaintiff seemed to be getting no treatment for his CFS, and that his fatigue might be connected to his anemia. (R. 19). As already noted, a plaintiff's course of treatment is an appropriate consideration in a credibility assessment. SSR 96-7p, 1996 WL 374186, *5; *Scheck*, 357 F.3d at 703. In this instance, however, the ALJ's characterization of the record is unfair. It is not as though plaintiff has not sought treatment for his CFS. The voluminous medical record demonstrates otherwise, with plaintiff's regular visits to the VAMC seeking relief of his symptoms depicting more of a desperation for treatment than a nonchalance about it. Also, given the nebulous nature of CFS, it is unclear what treatment the ALJ feels plaintiff is neglecting, if that is what she was suggesting with her comment. The ALJ also seemed to indicate that plaintiff's fatigue stemmed from his anemia rather than his CFS. The record reveals that while plaintiff received treatment for his anemia, however, his complaints of fatigue persisted. In any event, it is not clear how the source of plaintiff's fatigue – anemia or CFS – impacts on the credibility of his allegations that he suffers it. The court cannot accept the ALJ's characterization of plaintiff's course of treatment as accurate, and certainly not as a basis for disbelieving plaintiff's complaints of disabling fatigue.

The ALJ also addressed plaintiff's activities, and felt that they were inconsistent with his allegations of disabling fatigue. The ALJ questioned plaintiff's claim that less than a two-hour drive left him drained, when he was able to make a 1300-mile drive between Utah and Chicago each spring and fall in two days. (R. 20). She noted that plaintiff continued to ski. (R. 20). She stated that plaintiff was "aggressively" marketing a video game he invented, and that he worked summers testing software. (R. 20). Finally, she mentioned plaintiff's activities of mowing the lawn with a riding mower, household chores, shopping, reading, going to movies, attending church regularly, and playing video and card games. (R. 20). The ALJ's presentation of plaintiff's routine, however, glosses over certain points that would paint a significantly different picture of plaintiff's lifestyle.

While plaintiff testified that he mowed the lawn with a riding mower, he also explained that the job took him all day because he could only ride it for a few minutes at a time and had to rest frequently in between. (R. 47). He did testify that he microwaved things and washed his dishes – not necessarily taxing – and vacuumed and did his laundry, but he also related how just getting dressed in the morning took all the energy out of him. (R. 47). While plaintiff related that he went to movies with friends two or three times a month, he also related that he would have to take a three-hour nap before going. (R. 49). He testified that he might be able to read for thirty minutes before having to stop, or he might fall asleep early on. (R. 49). He also said he *tried* to attend church

services regularly. (R. 49). Also, there is nothing in the record to suggest that plaintiff is *aggressively* marketing his video game; he merely testified that he went to "conventions and stuff" over the last two years. (R. 31). Overall, then, the plaintiff's testimony does not relate the uninterrupted, continuous activity that might undermine allegations of debilitating fatigue, but the type of sporadic activity, punctuated with rest and naps, that is not inconsistent with a claim of disability.

The ALJ's failure to consider the difference between these two types of activity warrants a remand of this case to the Commissioner. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). In *Carradine*, the court explained that the plaintiff:

> does not claim to be in wracking pain every minute of the day. When she feels better for a little while, she can drive, shop, do housework. It does not follow that she can maintain concentration and effort over the full course of the work week.

360 F.3d at 755-56. Similarly, the court in *Clifford* found that the plaintiff's testimony that she did household chores, cooked simple meals, and vacuumed, but had to break for rest, did not undermine or contradict her claim of disabling pain. 227 F.3d at 872. The plaintiff here, not unlike the plaintiffs in *Carradine* and *Clifford*, did not claim that he was felled by fatigue every minute of the day. In fact, he explained that he had good days and bad days, and that he could engage in various activities, but only for brief periods and only if he could rest. As such, we cannot find that the ALJ's conclusion that plaintiff's activities are inconsistent with his allegations to be supported by substantial evidence.

Plaintiff's skiing despite his CFS seemed to present a separate credibility issue for the ALJ. Certain remarks the ALJ made during the administrative hearing, as well as her mention of it in her decision, imply that the ALJ was concerned about plaintiff's continuing to ski despite his complaints. The situation is similar to the that which the Sixth Circuit considered in *Cohen v. Secretary of Dept. of Health and Human Services*, 964 F.2d 524 (6th Cir. 1992). The plaintiff in that case was a professional ballroom dancer who was suffering from CFS associated with the Epstein-Barr virus. She continued dancing over much of the period for which she claimed disability benefits, from twice a week for three to four hours at a time to twice a month for an hour at a time. 964 F.2d at 529-30. She also had to rest all day in order to prepare for her dancing activities, however, and was "wiped out" for a couple of days after she danced. 964 F.2d at 530. The court found that such activity did not warrant a finding that the plaintiff had the capacity to maintain substantial gainful employment. *Id.* Instead, the court felt she was trying to maintain some semblance of normality in her life despite her chronic fatigue syndrome. 964 F.2d at 531. In this case, plaintiff's discussion of his skiing paints a similar picture:

> If you know what you are doing, you can ski for 20 or 30 seconds, stop beside the road, catch your breath, and that takes me three or four or five minutes. And then ski another few hundred yards down the hill. It's like hanging on desperately to whatever you can still do when you're handicapped.
>
>        *          \*          \**
>
> For 20 or 30 seconds, I can do anything that anybody alive can do. . . [The employee] race lasts 15 seconds. At the end of that time, sometimes I

cannot stand and other times I'm so bad that I puke afterwards. . . . I used to be a downhiller, a good downhiller. . . . Now I run a kiddy slalom. . . . And for 15 seconds, and at the end of it I am woozy, dizzy, and sometimes vomit from nausea . . . But it's like I don't want to give up.

(R. 33, 48). It is unclear to what extent plaintiff's efforts to ski might have swayed the ALJ's opinion as to his credibility or his capacity for work. In her decision, however, she did not discuss his testimony regarding those efforts in the context of someone attempting to lead a normal life in the face of their limitations. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1999) (disability claimant should not be penalize for attempting to lead a normal life through activities). Consequently, her treatment of that testimony undermines her assessment of plaintiff's credibility.

Although an ALJ's credibility determination is usually entitled to deference, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872. Here, the ALJ based her evaluation of plaintiff's credibility on his demeanor, course of treatment, and activities. Her characterization of plaintiff's course of treatment, as compared with the record, was inaccurate. Her account of plaintiff's activities, if not completely inaccurate, was less than thorough and slanted to depict a capacity for activity not supported by plaintiff's testimony. Accordingly, the court cannot find that the ALJ's conclusion that plaintiff's complaints of debilitating fatigue were not credible to be supported by substantial evidence, and must remand this case to the Commissioner.

As already noted, the plaintiff's objections to the ALJ's opinion do not end with the ALJ's treatment of his subjective complaints of fatigue. He contends that there are additional flaws in the ALJ's opinion. These purported flaws, however, do not cause the court as much concern as the ALJ's credibility determination. Rather, they are of the type that ask the court to ignore the "commonsensical reading" of the ALJ's opinion and engage in "nitpicking." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (*quoting Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir.1999)). In this particular instance, however, as a result of the subjective nature of CFS, the ALJ's credibility determination becomes intertwined with the balance of her decision and adversely affects it. As such, although the court has already determined a remand is warranted, it will briefly address plaintiff's additional arguments.

The plaintiff finds fault with the ALJ's treatment of his memory impairment and the effect it has on his capacity for work. More specifically, plaintiff argues that the ALJ improperly rejected Dr. Tomassetti's opinion that plaintiff's mental impairment resulted in moderate limitations on his ability to maintain concentration, persistence, and pace. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand*, at 19-20). Plaintiff also questions the ALJ's rejection of Dr. Zahid's opinion that plaintiff could not function on a job due to his memory impairment. (*Id.* at 21). Finally, the plaintiff contends that the ALJ failed to explore his mental limitations in her questioning of the VE. (R. *Id.* at 20).

Plaintiff's argument as to the ALJ's treatment of Dr. Tomassetti's opinion would appear to be misdirected, given the record. The ALJ determined that plaintiff suffered from a mild memory loss, which resulted in no more than a mild limitation in daily activities and social functioning, and a moderate limitation on his concentration, persistence and pace (R. 17), and that, overall, he had the ability to perform simple, unskilled work. (R. 17, 20). Dr. Tomassetti found that plaintiff had a mild memory impairment (R. 332), was moderately limited in the area of sustaining concentration and pace due to his tendency to tire easily (R. 341, 347), and, overall, that he had sufficient residual mental capacity to perform substantial gainful activity. (R. 347). As such, contrary to plaintiff's contentions, it would seem that the ALJ accepted Dr. Tomassetti's findings rather than rejected them.

Plaintiff attempts to clarify his argument in his response brief, where he explains that the ALJ's finding that plaintiff was limited to performing simple, unskilled work was "qualitatively different" from Dr. Tomassetti's finding that plaintiff was moderately limited in maintaining concentration and pace. (*Plaintiff's Response to Defendant's Motion for Summary Judgment*, at 7). The plaintiff submits that simple, unskilled work "includes the ability to understand, remember, and follow short and simple instructions" and "requires little or no judgment and can be learned in a short period of time." (*Id.*). He further submits that the limitations Dr. Tomassetti found do not affect these abilities, but "affect the ability to perform work processes on a sustained basis." (*Id.*). The plaintiff

then argues that the ALJ should have distinguished between these two types of limitations, rather than simply find plaintiff limited to simple, unskilled work. (*Id.*). The plaintiff offers little to suggest that this "qualitative" distinction has any substantive impact, however, and the Commissioner's regulations suggest that the two types of limitations are not so unrelated as plaintiff would argue. "Concentration, persistence, and pace" refers to the ability to "sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks." 20 C.F.R. Pt. 404, Subpt. P., App.1, § 12.00(C)(3). The difference between the ability to complete simple and complex tasks is, contrary to plaintiff's argument, part of the equation in assessing a claimant's limitations in this area. *Id.* A deficiency that is apparent only in performing complex tasks would not amount to a significant limitation in concentration, persistence, and pace. *Id.* In this instance, the ALJ's finding that plaintiff is limited to simple, unskilled work is an adequate acknowledgment of Dr. Tomassetti's opinion that plaintiff is only moderately limited in concentration, persistence, and pace. To require more of the ALJ in this regard would be to demand not just a "logical bridge" from evidence to finding, but an escort across it as well.

The court must also reject the plaintiff's argument regarding the ALJ's solicitation of testimony from the VE. The ALJ properly included plaintiff's limitation to simple, unskilled tasks in her hypothetical to the VE regarding plaintiff's past work as a cashier. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (to the extent the ALJ relies

on testimony from a vocational expert, the hypothetical question posed must incorporate all of the claimant's limitations supported by medical evidence in the record). Furthermore, even though the ALJ's hypothetical supposed a limitation to simple, unskilled work, and did not recite Dr. Tomassetti's findings verbatim, the VE, nevertheless, had an opportunity to consider plaintiff's "ability to perform work processes on a sustained basis." Upon questioning from plaintiff's counsel and the ALJ, the VE testified that plaintiff's past work was not stressful in terms of quotas, deadlines, or fast pace. In so doing, the VE specifically addressed the very types of limitations the plaintiff contends were not a part of the ALJ's finding that plaintiff was limited to simple, unskilled work. *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (noting that a VE may learn of limitations not included in the ALJ's hypothetical through other questioning and account for them in their testimony).

The plaintiff next objects to the ALJ's treatment of Dr. Zahid's report. In advancing this argument however, the plaintiff seems to confuse the ALJ's treatment of Dr. Tomassetti's opinion with her treatment of Dr. Zahid's opinion. The plaintiff argues that the "ALJ gave no weight to Dr. Tomassetti's opinions" – which is an inaccurate premise, as already explained – "on the mistaken belief that Dr. Tomassetti had given no weight to Dr. Zahid's report." (*Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand*, at 19-20). Actually, the ALJ addressed the two doctors' findings as follows:

> [t]he psychological consultant, having diagnosed only *mild* memory loss, inconsistently states he is not sure how claimant could function on a job with his memory impairment. Perhaps he was taking literally claimant's dramatic assertion that his memory is so bad he cannot function. The state agency chose not to adopt the findings of its consultant (13F, 14F) and, as it is unsupported by the evidence and claimant's [activities of daily life], is given no weight herein.

(R. 20). Perhaps the ALJ could have been a bit more specific in his references, but Dr. Zahid was the only psychological consultant who found plaintiff had *only a mild* impairment, but nevertheless concluded he would be unable to function in any job. (R. 305-06). The court cannot join the plaintiff in faulting the ALJ for characterizing this as an unsupported and inconsistent conclusion. Also, in finding that plaintiff retained the mental capacity for work, Dr. Tomassetti -- the state agency reviewer whose report is set out in exhibits 13F and 14F -- chose not to accept that conclusion, focusing instead on Dr. Zahid's contrary findings indicating that plaintiff's impairment was mild. Thus, both the ALJ and Dr. Tomassetti rejected Dr. Zahid's opinion, and did so based at least in part on Dr. Zahid's own assessment of plaintiff's impairment as "mild." Plaintiff's argument in this regard, then, is misdirected, or based, perhaps, on a misreading of the ALJ's opinion.

That being said, the court must acknowledge that, in addition to Dr. Zahid's assessment of the plaintiff's memory impairment as mild, the ALJ also mentioned plaintiff's activities as failing to support Dr. Zahid's conclusion. As the court has already concluded that the ALJ's treatment of plaintiff's activities requires a remand, it will not revisit that discussion here. To the extent the ALJ rejected the doctor's opinion based on

plaintiff's activities, however, that rationale would be undermined by the ALJ's faulty treatment of the plaintiff's subjective complaints, as discussed *supra*.

Finally, plaintiff contends that the ALJ improperly disregarded Dr. Wu's opinion as to his residual functional capacity. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand*, at 21-22). After reviewing plaintiff's medical records, Dr. Wu noted that he had CFS and could not perform any activity for more than one or two hours. (R. 323). He indicated that medical support for this limitation could be found in the VAMC records. (R. 325-330). The ALJ rejected Dr. Wu's opinion, because it was based on a 1995 diagnosis of CFS and because the doctor offered no independent support for his conclusions, relying instead on the record, as a whole, from the VAMC. (R. 20).

In this instance, although Dr. Wu had once been plaintiff's treating physician, he was not bringing that experience to bear on this case; he was merely reviewing the treatment notes from the VAMC. As such, his opinion was not entitled to the type of deference afforded a treating, or even an examining, source. 20 C.F.R. § 404.1527(d)(1); (2). *Clifford*, 227 F.3d at 870 ("more weight is generally given to a treating physician because of his greater familiarity with the claimant's conditions and circumstances"). Nevertheless, even the opinion of a nonexamining medical source must be considered under the regulations, which provide that:

> [t]he better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we

will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.

20 C.F.R. § 404.1527(d)(3). Here, the ALJ's reasoning for rejecting Dr. Wu's opinion focused on the fact that Dr. Wu, himself, had not examined plaintiff since he had been diagnosed with CFS and could therefore provide no medical findings of his own to bolster his opinion. This rationale strays from the dictates of the regulations a bit: the regulations do not require independent support for a nonexamining source's opinion, where, as here, the doctor's opinion is based on his consideration of a preexisting medical record. If they did, the opinions of nonexamining state agency doctors, upon which ALJs so often rely, would be worthless. This is not to say that Dr. Wu's opinion is any more convincing than any other opinion in the record, especially given Dr. Wu's rather wide-ranging citation to nearly two-hundred pages of medical records as support for his conclusion. (R. 218-266, 356–490). But, again, the ALJ found that those hundreds of pages of medical records established that plaintiff suffered from CFS. That brings the question full-circle to the subjective effects of the disease and the ALJ's treatment of plaintiff's allegations regarding fatigue. Thus, even though certain of plaintiff's arguments are unconvincing, the court, as previously discussed, must nevertheless remand this case in light of the ALJ's treatment of the subjective nature of plaintiff's impairment.

The issue of the appropriate weight to attribute a medical opinion leads the court to a final point. This is a case without any opinion as to plaintiff's capacity for work from a treating source. The vagueness of CFS, alone, would make this case a difficult matter

for both an ALJ and a reviewing court. Without any sense of plaintiff's capacities or the effects of his disease from a treating source – and the record documents more than five years of treatment – the nature of plaintiff's impairment almost necessitates a somewhat vague decision and a difficult review. The record reveals that the plaintiff's attorney apparently attempted to secure a medical opinion from a treating source but was unable to do so, for one reason or another. (R. 50-51). This would seem to be a case where, on remand, the ALJ should contact the plaintiff's treating source in an effort to obtain a medical opinion as to effect CFS has on his capacity for work. 20 C.F.R. § 404.1512(e)(1)(seeking additional evidence or clarification from a medical source when the report contains an ambiguity that must be resolved); *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994). Failing that, the ALJ should resort to a medical expert to provide an informed basis for determining whether plaintiff's CFS is disabling. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).

## CONCLUSION

For the foregoing reasons, the court grants summary judgment in favor of the plaintiff, Stewart Davies, and remands this case to the Commissioner for further

proceedings consistent with this Memorandum Opinion and Order.  Defendant's cross-motion for summary judgment is denied.

ENTERED: _____

IAN H. LEVIN
UNITED STATES MAGISTRATE JUDGE

**DATE:** December 29, 2004